■ In the Matter of MOHAWK VALLEY ORGANICS LLC, Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Respondents. [787 NYS2d 188]—

Carpinello, J. Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Montgomery County) to review a determination of respondent Commissioner of Environmental Conservation which revoked petitioner's solid waste permit.

At issue is a determination of respondent Commissioner of Environmental Conservation (hereinafter respondent) revoking a solid waste permit that had been issued to petitioner in October 2000. The permit authorized the construction and operation of an open air composting facility in Montgomery County. As substantial evidence in the record supports respondent's determination (see CPLR 7803 [4]), we confirm.

The record reveals the following pertinent facts. Shortly after the commencement of petitioner's operations in the spring of 2001, nearby residents began to complain to local officials about an offensive odor, akin to a decaying animal, in the vicinity of the facility. Local officials worked with petitioner in an attempt to address the issue prior to any involvement by respondent Department of Environmental Conservation (hereinafter DEC), which was not made aware of the odor problem until July 2002.

At this time, and for several months thereafter, DEC officials investigated, and confirmed, the presence of a strong, noxious odor emanating from petitioner's facility. An order on consent was executed between petitioner and respondent in September 2002 pursuant to which petitioner agreed to modify certain aspects of its composting process to address the odor problem and to implement a tracking and mitigation plan to document and respond to future odor complaints. Notwithstanding these efforts, complaints continued about offensive odors from the facility. DEC officials confirmed that an odor problem indeed persisted and that the odor derived from petitioner's facility. It

was further discovered during this time period that petitioner had exceeded a 100 ton per day limitation on its acceptance of biosolids from municipal wastewater treatment plants.

With respect to petitioner's claim that the record contains "virtually no evidence" to support the conclusion that its facility was the source of the offensive odors, particularly a stench described by many as the odor of "death," we are unpersuaded given the testimony of several DEC staff members involved in the matter. George Elston, a DEC environmental engineering technician, testified that, after receiving complaints in July 2002, he investigated and confirmed that there was an on-site odor which impacted the surrounding neighborhood. Specifically, according to Elston, between July 16, 2002 and February 22, 2003, he went to the vicinity of petitioner's facility on approximately 17 occasions to investigate the odor issue and detected an offensive odor from the facility a majority of the time. Elston testified that he knew the odors emanated from petitioner's facility because they were consistent with the on-site odor and by reference to wind direction. Elston further established that he continued to receive numerous and frequent complaints about the odor long after the consent order was executed, that he verified the presence of these odors himself and that they had a deleterious impact on the lives of surrounding residents.

Next, Richard Forgea, a DEC solid waste engineer, testified that he also went to the area of the facility during the course of DEC's investigation into the complaints and personally detected odors at various locations and on more than one occasion. According to Forgea, the smell ranged from the smell of a dead animal to the smell of rotting fish. He further described the odor as "fairly unique" and "almost unbearable." When asked how he determined that petitioner's facility was the source of the odors, Forgea, like Elston, testified that he came to this conclusion by comparing the nature of the odors on site and off site and by reference to wind direction.

Other DEC environmental engineers gave consistent testimony. Thomas Reynolds described being overcome with nausea during a December 2002 visit to the vicinity after coming into contact with a strong odor. Reynolds similarly described the odor as that of a dead animal or rotten fish. Anthony Kokocki, who performed a reconnaissance of the area on six days in December 2002, detected an "odor of death" on two such occasions and an unpleasant odor on three occasions.

In addition to the testimony of these DEC officials, several individuals who had firsthand knowledge of the odor because of

their presence in the neighboring community established the offensive nature and duration of the odor, including its deleterious impact on their daily lives and health. Even petitioner's own expert, hired to perform an odor survey in November 2002, admitted that the facility had a three to four-mile "odor footprint" with a higher odor intensity within 1½ miles of it. Thus, there was substantial evidence that petitioner's facility created odors which were a nuisance to the surrounding area in violation of 6 NYCRR 211.2, 360-1.14 (m) and former 360-5.3 (h) (see e.g. Matter of Lane Constr. Corp. v Cahill, 270 AD2d 609 [2000], lv denied 95 NY2d 765 [2000]).

Additionally, substantial evidence supports the determination that on numerous occasions petitioner violated that aspect of its modified permit which limited the amount of biosolids it could accept from municipal waste water sources. Significantly, petitioner did not dispute that it accepted more than 100 tons of biosolids on these occasions, but claimed that it was his understanding that the 100-ton limit was to be calculated by use of a monthly average. This excuse is in direct contradiction of the plain terms of the permit and was also refuted at the hearing. Thus, respondent's rejection of petitioner's explanation for the blatant permit violation will be accorded due deference (see e.g. Matter of Sickler v Town of Hunter, 3 AD3d 727 [2004]).

Also unavailing is petitioner's contention that respondent departed from prior precedent by finding that odors inherent in the composting operation constituted a regulatory nuisance. In the case relied upon by petitioner, Merion Blue Grass Sod Farm (1984 WL 19248, 1984 NY Env LEXIS 21 [NY St Dept Envtl Conservation, Case No. 3-0646, Jan. 27, 1984]), a senior DEC engineering technician assumed the role of an environmental monitor at a sod farm following complaints of noxious odors. This DEC monitor, expressly found to be an unbiased witness, documented odors that were "mostly mild and transitory" in nature and that could be abated with prompt action (i.e., the halting or postponement of certain operations pending more favorable conditions). Thus, the subject odors in Merion Blue Grass did not rise to the level of a nuisance as defined by the applicable regulations. The facts of this case are markedly different. In short, the odors emanating from petitioner's facility were neither mild nor transitory such that respondent was required under Matter of Charles A. Field Delivery Serv. (66 NY2d 516 [1985]) to either find in petitioner's favor under Merion Blue Grass or explain her departure from such precedent.

We have reviewed petitioner's remaining contentions, includ-

ing its claim that revocation of its permit shocks one's sense of fairness (*see Matter of Pell v Board of Educ.,* 34 NY2d 222, 233 [1974]), and are unpersuaded.

Cardona, P.J., Mercure, Rose and Lahtinen, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.