OPINION OF THE COURT
Arthur M. Diamond, J.
The petitioners, County of Nassau and Edward E Mangano as County Executive (County) commenced this action pursuant to *229 article 78 of the CPLR for a judgment annulling and vacating the respondent Nassau County Interim Finance Authority’s (NIFA) Resolution No. 11 and supporting determination dated January 26, 2011 which imposed a control period on the County pursuant to Public Authorities Law § 3669 (1).
The County also moved for an order granting a preliminary injunction pursuant to CPLR 6301, 6311 and 7805 thereby restraining and enjoining NIFA from continuing to impose the control period upon it and from exercising any of its powers set forth at Public Authorities Law § 3669.
Respondent NIFA cross-moved for an order pursuant to CPLR 7804 (f) and 3211 (a) (1), (7) denying the petition and dismissing this proceeding.
The hearing on the preliminary injunction was held on February 18, 2011. At the conclusion of the proceeding, NIFA was stayed by the court from taking any action pending the determination of the County’s motion for a preliminary injunction.
Procedural History
The NIFA Act was enacted on June 23, 2000 pursuant to a home rule message which had been proposed by the County Executive and approved by a vote of the County Legislature. The legislative history indicates that in enacting the act, the Legislature found that “a condition of fiscal difficulties . . . exist[ed] and ha[d] existed for several years in the county of Nassau” which resulted in the repeated reduction of the County’s bond ratings and, as a consequence, increased interest costs being borne by the County. (L 2000, ch 84, § 1.) The Legislature found and declared
“that the continued existence of such condition of fiscal difficulties is contrary to the public interest of the county and the state and seriously threatens to cause a decline in the general prosperity and economic welfare of the inhabitants of the county and the people of this state [and that] [t]he impairment of the credit of the county of Nassau may affect the ability of other municipalities in the state to issue their obligations at normal interest rates. Such effect is a matter of state concern.” (Id.)
The legislative history also indicates that the County had
“requested] the enactment of all of the provisions of [the] act as necessary and in the public interest to accomplish the objective of improving market *230 reception for the necessary sale of bonds and other obligations of the county by discouraging certain practices which have occurred in the past and providing direction and assistance in budgetary and financial matters to restore the county to fiscal health, while retaining the county’s right to operate independently as a municipal corporation of the state of New York.” (Id.)
Indeed, the statute itself provides:
“It is hereby determined that the creation of [NIFA] and the carrying out of its corporate purposes are in all respects for the benefit of the people of the state of New York and are public purposes. Accordingly, [NIFA] shall be regarded as performing an essential governmental function in the exercise of the powers conferred upon it by this title.” (Public Authorities Law § 3661 [1].)
The act authorized NIFA to issue bonds and notes for various county purposes and to closely oversee the County’s budget and finances. Pursuant to the act, the County was provided with a $100 million state subsidy ($25 million per year through 2004) as well as a state grant of $5 million to assist the County in streamlining the tax certiorari process. NIFA has issued in excess of $1.6 billion in bonds for the County’s benefit and assisted the County by restructuring maturing debt, refinancing existing debt and borrowing money.
The act provided for an “interim finance period” during which time the County was required to demonstrate: (1) based upon annual audit reports for three consecutive fiscal years, that it had adopted and adhered to budgets covering all expenditures which did not show a major operating deficit when calculated pursuant to generally accepted accounting principles (hereinafter refer to as GAAP) and that there was a substantial likelihood that the County’s operations for the current fiscal year would not show a deficit in the major operating funds in accordance with GAAP either; and (2) that the securities sold in the general public market by or for the County’s benefit during the fiscal year immediately preceding as well as the current fiscal year satisfied the financing requirements of the County and that there was a substantial likelihood that such securities could be sold in the general public market from that date through the end of the next fiscal year in amounts sufficient to satisfy substantially all of the County’s capital and seasonal financing requirements in accordance with the County’s fiscal plan. (Public Authorities Law § 3651 [14].)
*231 During the interim finance period, NIFA was required to approve or disapprove the County’s budget and current year financial plans based on whether or not they met the fiscal balance requirements set forth in the act.
The interim finance period established via the act’s enactment was scheduled to end in 2004. (Public Authorities Law § 3651 [14].) In 2003, the interim finance period was extended by the Legislature to 2007 over the County Executive’s objection. County Executive Suozzi maintained that an extension was “unnecessary and redundant” because there was already “a mechanism for continuing oversight: a control period.” (Letter from Thomas R. Suozzi, July 21, 2003, Bill Jacket, L 2003, ch 314, at 11.) In 2007, the Legislature again extended the interim finance period through 2008 finding that its “insight, expertise and guidance [was] needed and necessary for the foreseeable future.” (Bill Jacket, L 2007, ch 364, at 4.) The interim finance period expired in 2008.
Thereafter, pursuant to the act, NIFA continued to review and issue detailed reports on the County’s budget and financial plans. In fact, in its December 3, 2008 report NIFA noted:
“Last year, after NIFA approved the County’s [fiscal year] 2008-2011 multi-year plan, the County borrowed for certiorari judgements and settlements over the unanimous objection of the NIFA directors.
NIFA considers this borrowing practice to be one of, if not the preeminent, reason for the original fiscal crisis of the County, which led to the creation of NIFA by the State.” (Order to show cause, affidavit of Tomas Sullivan, exhibit H, at 1.)
It cautioned that because the tax certiorari borrowing would probably exceed one percent of the County’s budget, it would be required to make a determination “unless the County can convince NIFA that the borrowed funds should count as revenue.” {Id.) A letter authored by the County’s bond counsel which concluded that bond revenues could be budgeted as operating revenues without limit after the interim financing period did just that.
In its May 28, 2009 report, NIFA commented,
“[the County’s] actions are troubling because:
“Use of bond proceeds and off-budget reserves to pay operating expenses masks an imbalance that many would characterize as a deficit, and also exacerbates the budgetary gaps that must be re *232 solved in future years, both by deferring the necessary steps to correct the imbalance and layering on debt service for current year borrowings.
“The County has continued to rely on its practice of bonding items that should be funded with operating income; for example, tax certiorari refunds.”
Indeed, in its May 2009 report, NIFA acknowledged that $58.8 million in bond proceeds had been used in 2008 to pay tax certiorari claims. While it does not expressly state that that would not be permitted in the future, it declared that it “masks an imbalance that many would characterize as a deficit.” Similarly, while NIFA again acknowledged in its October 2009 report that the County would likely use $27.7 million in borrowed funds to pay tax certiorari claims in order to achieve a balanced budget and that only $50 million of the $90 million needed in financial year 2010 for tax certiorari claims would come from operating funds with the remainder presumably coming from borrowed funds, it noted, “[r]egrettably, the County already bonds for certiorari settlements . . . , both of which should also come out of the operating budget.” In 2009 and 2010, based on the County’s bond counsel’s opinion that bond funds used to pay tax certiorari obligations could be budgeted as operating revenue, coupled with efforts by the County to pay a portion of those claims from actual operating revenues, NIFA permitted deficits that might otherwise have triggered a control period.
Similarly, NIFA allowed the County to use $13.4 million in general reserve fund balance in 2006, $38.1 million in 2007, $17.9 million in 2008 and $10 million in 2009 to balance the budget. In 2011, it has disallowed its use of the $65 million reserve fund balance.
When the County issued bond offerings in December 2009, November 2010 and as recently as December 16, 2010, the bond offerings noted not only the history of the act including the interim finance period which it noted had expired in 2008, but NIFA’s continuing “ongoing monitoring and review of the County’s financial operations” as well as NIFA’s power “to impose a control period” under certain conditions set forth in the statute, including a determination that “there exist[ed] a substantial likelihood and imminence that [the County] will incur a major operating funds deficit of more than one percent in the aggregate results of operations during its Fiscal Year 2011 assuming all revenues and expenditures are reported in accordance with [GAAP].” The bond offering also noted that
*233 “[d]uring a control period NIFA would be required to withhold transitional State aid and is empowered, among other things, to approve or disapprove proposed contracts and borrowings by the County and Covered Organizations; approve, disapprove or modify the County’s Multi-Year Financial Plan; issue binding orders to the appropriate local officials; impose a wage freeze; and terminate the control period upon finding that no condition exists which would permit imposition of a control period.”
These statements were certified by the County Treasurer who is the County’s “chief financial officer” under the County Charter and the act. (Public Authorities Law § 3651 [3].)
On September 15, 2010, the County submitted its fiscal plan for 2011-2014 which included its proposed budget for 2011. In its preliminary review dated September 28, 2010, NIFA found that the proposed 2011 budget was not adequately balanced. Anticipated revenues totaling $244.4 million were deemed “risky,” which included $100 million bonding/borrowing to pay tax certiorari awards; $61 million in labor savings; $26 million in a Long Island Bus subsidy; $17.3 million in red light camera expansion; $8.3 million in County Clerk’s fees; $8 million in NIFA restructuring savings; $7.3 million in Traffic and Parking Violation Agency (TPVA) fines; $5 million in Long Island Expressway patrol surcharge; $4.8 million in inmate health care initiative; $3.4 million in housing Suffolk inmates; $2.3 million in parks fees; and $1 million in boot and tow initiative.
NIFA noted that in this budget no county revenues were being used to pay tax certiorari claims and that the $100 million in bonding revenues being used instead created a long-term expense, required the County Legislature’s approval and was contrary to NIFA’s long-standing history of opposing the County’s reliance on long-term debt to cover current operating expenses. Indeed, the act itself specifically required the County to both gradually reduce the use of borrowed funds to pay tax certiorari obligations and to convert to pay as you go (PAYGO). In fact, the NIFA Act specifically permitted the County to treat tax certiorari borrowing as operating revenue at decreased levels in 2006 and 2007 and not at all thereafter assuming GAAP were followed. (See Public Authorities Law § 3667 [1].)
NIFA further found the $61 million in projected labor savings risky because those savings required legislative enactment to permit the County to reduce wages if violative of contracts and *234 faced legal opposition even if passed. NIFA found the $26 million Long Island Bus subsidy risky because the Metropolitan Transportation Authority had removed that funding from its 2011 budget and indicated that Nassau County must resume total funding of its bus operation. NIFA found the red light camera expansion risky because, inter alia, it required state approval. It found the $8.3 million in County Clerk fees risky because it required county legislative approval. It found the $8 million restructuring of NIFA debt risky because it was not attainable. It found the $7.3 million in TPVA fines and $5 million in Long Island Expressway patrol surcharge risky because they required county and state legislative approval, respectively. The $4.8 million savings in inmate health care was found speculative because it was dependent upon a yet to be entered contract. It found the proposed $3.4 million in net revenue for housing Suffolk inmates risky because it was dependent on both the completion of the construction of a cell block and the availability of 100 Suffolk prisoners. It found the proposed $2.3 million in parks fees speculative because any increase required the County Legislature’s approval which was historically resisted and depended on new contested revenues in the form of advertising revenue and summer programs.
The $244.4 million in risky revenues NIFA found in the County’s 2011 budget was more than twice the amount found in 2009. The Nassau County Comptroller issued a report similar to that of NIFA’s quantifying the risk items at $258.1 million and likewise, the County Office of Legislative Budget Review issued a report quantifying budget risks at $245.7 million. Despite a presentation by the County Executive, NIFA’s continuing concern caused it to retain Judith S. Kaye of Skadden, Arps, Slate, Meagher & Flom LLP to advise it.
The County enacted its multi-year budget plan including the 2011 budget on October 30, 2010, which contained revenues and cost savings which were found to be “risky” by NIFA. It added “contingencies” including a securitization of Mitchel Field leases equaling $30 million, potential county land sales totaling $25 million and $5.3 million in various expense reductions. Days later, November 4, 2010, Moody’s downgraded the County’s short-term and long-term credit rating and found that approximately $158 million of revenues and expenditures in the County’s budget was risky.
NIFA made repeated requests for documents to support the County’s budget and extensive talks took place between the *235 County and NIFA’s retained accountant, Grant Thornton, LLE In fact, On December 29, 2010, the County Executive submitted a letter representing that he had reached an agreement with the County Legislature regarding the 2011 tax certiorari claims and that he had ordered $23 million in budget costs. In addition, that letter identified $157.9 million in new additional contingencies. At a meeting with NIFA on December 30, 2010, no further details regarding the new found $157.9 million new contingencies were provided. And, when GAAP were applied, as required by the statute, a projected deficit of $176 million was found by NIFA, which disallowed the $100 million borrowed funds and $27 million of the $30 million from the sale of Mitchel Field leases to be counted as operating revenues. On January 25, 2011, the County Executive announced an agreement with the Civil Service Employees Association that would yield a savings of only $2 million, leaving the projected $61 million in labor savings unsupported.
NIFA provided the County with yet another opportunity to provide additional information to alleviate its concerns regarding the County’s budget. The County responded describing its position with supporting data.
Despite the fact that numerous risks were eliminated, NIFA found that an operating deficit of $119.5 million remained, plus $100 million in bonding for tax certiorari obligations. The County claimed that new found contingencies will result in additional revenues of $70.5 million resulting in a projected $49 million budget deficit not including the bond revenues. However, NIFA noted the new found additional contingencies were risky and the County had not even established that the Legislature would approve of the new contingencies submitted to NIFA.
Ultimately, on January 26, 2011 NIFA enacted its resolution imposing a control period pursuant to Fublic Authorities Law § 3669 (1) (b) on the ground that there existed a substantial likelihood and imminence of the County incurring a major operating fund deficit of one percent or more in the aggregate results of operations during 2011.
NIFA’s resolution required the County to submit a financial plan for 2011 by February 15, 2011, which eliminated what NIFA identified as unacceptable risks and to present guidelines representing the categories and types of contracts and other obligations to be reviewed by NIFA in carrying out its authority under the NIFA Act.
In its determination, NIFA specifically articulated numerous reasons for its imposition of a control period. Freliminarily, it *236 noted that the act required it to assess whether there was a substantial likelihood and imminence that the County would experience a one percent or more deficit in its operating funds assuming GAAP were followed and if so, to impose a control period. It noted that it had rejected budgets with smaller risks, i.e., $81.7 million in 2001 which the County reduced to $6.3 million; $55 million in 2002; and $125 million in 2009, which the County reduced to $53 million. It also noted that in October 2000, it made clear that counting reserve fund balance surpluses as operating revenue violated the act. It noted that from 2000 through 2004, the County amassed $285 million in reserves, which had dwindled to approximately $65 million and was not in accordance with NIFA’s requirements. (See Public Authorities Law § 3667 [4] [c].) And, it noted that no efforts to replenish that reserve fund balance were being made either, again, in violation of the act. NIFA also noted that borrowing funds for tax certiorari obligations and budgeting that as operating revenue was supposed to be phased out and ultimately end and that while efforts had been made from 2006 to 2010 to PAYGO at least a portion of those obligations and finance only the excess, the 2011 budget reverted to 100% borrowing for tax certiorari obligations which was being treated as operating revenue, in direct contravention of not only the historical path away from that but more importantly, NIFA’s goals.
NIFA also stated that federal stimulus funding decreased from $40 million in 2009 and 2010 to $20 million in 2011; one-shot revenues of significant sizes weren’t available; taxes weren’t increased, in fact, the energy tax had been repealed; and that County contracts which ran through 2015 prohibited layoffs through 2011.
In its determination, NIFA stated that the County was returning to practices that precipitated the enactment of the NIFA Act. NIFA also noted that the budgetary risk for 2011 was more than twice that found unacceptable in 2009 and that its conclusion was in fact consistent with the County Comptroller’s and the County Office of Legislative Budget Review. NIFA noted Moody’s downgrade of the County’s credit rating and the numerous opportunities it had afforded the County to rectify its budget, which it found went unheeded.
NIFA noted that even without the bonding of the tax certiorari claims, there were $119 million in risky revenues. Coupled with $100 million in bonding, a total of $219 million existed. Even allowing new highly probable successful offset items *237 identified by the County post-budget, i.e., Mitchel Field lease securitization, land sales and hiring freeze, the deficit remained at $49 million, again, nearly twice the one percent figure of $27 million. NIFA noted that allowing the tax certiorari borrowing and the Mitchel Field lease proceeds to count as operating revenue was violative of GAAP And, whether the Legislature would authorize the borrowing for the tax certiorari funds remained to be seen.
Pursuant to Public Authorities Law § 3669 (2), the imposition of this control period affords NIFA significant power over the County. Essentially, while Public Authorities Law § 3669 (2) (a) (i) requires NIFA to consult with the County in preparing its financial plan, NIFA is required to “prescribe the form of the financial plan and the supporting information required in connection therewith” (Public Authorities Law § 3669 [2] [a] [ii]), and to “exercise the rights of approval, disapproval and modification with respect to the financial plan, including but not limited to the revenue estimates contained therein” (Public Authorities Law § 3669 [2] [a] [iii]).
During a control period, Public Authorities Law § 3669 (2) (b) requires NIFA
“from time to time and to the extent it deems necessary or desirable in order to accomplish the purposes of [the Nassau County Interim Finance Authority Act (the act)] [to] (i) review the operations, management, efficiency and productivity of such county operations and of such covered organizations or portions thereof as [NIFA] may determine, and make reports thereon; (ii) audit compliance with the financial plan in such areas as [NIFA] may determine; (iii) recommend to the county and the covered organizations such measures relating to their operations, management, efficiency and productivity as it deems appropriate to reduce costs and improve services so as to advance the purposes of [the act]; and (iv) obtain information of the financial condition and needs of the county and the covered organizations.”
To that end, Public Authorities Law § 3669 (2) (c) requires NIFA to review so much of the County’s financial statements and projections, budgetary data and information and management reports and materials that NIFA deems necessary or desirable and to inspect, copy and audit the County’s books and records to the extent it deems necessary or desirable in order to *238 accomplish the goals of the act. Pursuant to Public Authorities Law § 3669 (2) (d), NIFA is required to disapprove or approve contracts entered into by the County; pursuant to Public Authorities Law § 3669 (2) (e), NIFA is required to approve borrowing by the County; pursuant to Public Authorities Law § 3669 (2) (f), NIFA is required to order county officials to take such actions it deems necessary to accomplish the purposes of the act; and, pursuant to Public Authorities Law § 3669 (2) (g), NIFA is required to authorize withholding of transitional state aid during a control period. Pursuant to Public Authorities Law § 3669 (3), NIFA has the power to declare an unlimited fiscal crisis and freeze wages until the end of the control period and pursuant to Public Authorities Law § 3669 (4) (a), the County’s employees are specifically prohibited from incurring any obligations or liabilities or entering into any contracts which have not been authorized by NIFA during the control period.
In view of the extensive powers bestowed on NIFA by its imposition of a control period, the County has brought this article 78 proceeding challenging NIFA’s determination. While petitioners concede that this legislation was properly enacted in accordance with the Constitution, petitioners claim that the control period to be exercised by NIFA under Public Authorities Law § 3669 (1) (b) is unconstitutional because once the interim finance period expired in 2008 pursuant to Public Authorities Law § 3651 (14), New York State no longer had a substantial state interest in the county budget and its authority is now only limited to monitoring and reviewing the county budget. According to petitioners, when the interim finance period expired, the control period could not be exercised without section 3669 of the Public Authorities Law being reenacted by the New York State Legislature in accordance with section 2 (b) (1) of article IX of the New York State Constitution. Lastly, the County maintains, in any event, that NIFA’s determination is arbitrary and capricious because it is not only unfounded but, more importantly, diverges from its past determinations without explanation or reason.
Decision
The petitioners have the burden of proving entitlement to a preliminary injunction. “Although the purpose of a prehminary injunction is to preserve the status quo pending a trial, the remedy is considered a drastic one, which should be used sparingly” {Trump on the Ocean, LLC v Ash, 81 AD3d 713, 715 [2d Dept *239 2011], citing McLaughlin, Piven, Vogel v Nolan & Co., 114 AD2d 165, 172 [2d Dept 1986]) since it “prevents litigants from taking actions that they would otherwise be legally entitled to take” (Matter of Related Props., Inc. v Town Bd. of Town/Vil. of Harrison, 22 AD3d 587, 590 [2d Dept 2005], citing Uniformed Firefighters Assn. of Greater N.Y. v City of New York, 79 NY2d 236, 241 [1992]). To obtain injunctive relief, the County must establish “(1) a likelihood of success on the merits, (2) irreparable harm in the absence of an injunction, and (3) a balance of the equities in favor of the injunction.” (Trump on the Ocean, LLC v Ash at 715, citing Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; W.T. Grant Co. v Srogi, 52 NY2d 496 [1981]; Apa Sec., Inc. v Apa, 37 AD3d 502, 503 [2d Dept 2007].) While issues of fact alone do not require the denial of preliminary injunctive relief, “[t]o sustain its burden of demonstrating a likelihood of success on the merits, the [County] must demonstrate a clear right to relief which is plain from the undisputed facts.” (Matter of Related Props., Inc. v Town Bd. of Town/Vil. of Harrison at 590, citing Gagnon Bus Co., Inc. v Vallo Transp. Ltd., 13 AD3d 334 [2004]; Dental Health Assoc. v Zangeneh, 267 AD2d 421 [2d Dept 1999]; Blueberries Gourmet v Aris Realty Corp., 255 AD2d 348 [2d Dept 1998].) A temporary injunction should not be granted where the facts are in sharp dispute. (Matter of Related Props., Inc. v Town Bd. of Town/Vil. of Harrison at 590, citing Blueberries Gourmet v Aris Realty Corp., supra.)
Constitutional Authority of NIFA
The New York State Legislature enacted a special law in the year 2000 which created the Nassau County Interim Finance Authority under title 1 of article 10-D of the Public Authorities Law. The special law was enacted at the request of the County Executive of Nassau County, and approved by a vote of the Nassau County Legislature which is known as the home rule message embodied in section 2 (b) (2) of article IX of the New York State Constitution. While petitioners concede that this legislation was properly enacted in accordance with the Constitution, petitioners claim that the control period to be exercised by NIFA under Public Authorities Law § 3669 (1) (b) is unconstitutional because once the interim finance period expired in 2008 pursuant to Public Authorities Law § 3651 (14), New York State no longer had a substantial state interest in the county budget and its authority is now only limited to monitoring and reviewing the county budget. According to petitioners, when the interim *240 finance period expired, the control period could not be exercised without section 3669 of the Public Authorities Law being reenacted by the New York State Legislature in accordance with section 2 (b) (1) of article IX of the New York State Constitution.
Petitioners have the burden of showing beyond a reasonable doubt that the control period provision of section 3669 of the Public Authorities Law is unconstitutional. (McKinney’s Cons Laws of NY, Book 1, Statutes § 150, at 320-321.) A statute is presumptively constitutional and should be construed in such a manner as to uphold its constitutionality. (Matter of Schultz Mgt. v Board of Stds. & Appeals of City of NY, 103 AD2d 687, 688-689 [1984], affd 64 NY2d 1057 [1985], citing Eaton v New York City Conciliation & Appeals Bd., 56 NY2d 340, 345 [1982].) Moreover, “[t]he party alleging unconstitutionality [of a statute] has a heavy burden, one of demonstrating the infirmity beyond a reasonable doubt, and only as a last resort will courts strike down legislative enactments on the ground of unconstitutionality.” {Matter of Schultz Mgt. v Board of Stds. & Appeals of City of N.Y. at 689, quoting Sgaglione v Levitt, 37 NY2d 507, 515 [1975, Cooke, J., dissenting].) “Thus, where an act is susceptible of two constructions, one of which will make it constitutional and the other unconstitutional, the former will be adopted.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150, at 324.)
The NIFA Act was enacted pursuant to section 2 (b) (2), and not section 2 (b) (1), of article IX of the New York State Constitution. Section 2 (b) of article IX states, in pertinent part:
“Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature: . . .
“(2) Shall have the power to act in relation to the property, affairs or government of any local government ... by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership.”
Concomitantly with the passage of article IX of the New York State Constitution in relation to the Bill of Rights and home rule powers for local government, the New York State Legislature enacted Legislative Law § 55 which provided as follows:
“The legislature shall prescribe by rules to be promulgated from time to time by concurrent resolution of the Senate and Assembly the forms of requests to be submitted to it by counties, cities, *241 towns and villages with respect to the enactment of special laws pursuant to paragraph two of subdivision (b) of section two of article nine of the constitution and the manner of communication of such requests to the legislature.”
While section 55 of the Legislative Law references the requirement of compliance with section 2 (b) of article IX of the New York State Constitution with respect to the enactment of special laws pursuant to the home rule message, there is no mention in this statute that there be compliance with the reenactment requirement provision of section 2 (b) (1) of article IX of the New York State Constitution.
Petitioners claim that the control period to be exercised by NIFA under Public Authorities Law § 3669 repealed, diminished, impaired or suspended the powers of the Nassau County government and therefore that statute must be reenacted pursuant to section 2 (b) (1) of article IX of the New York State Constitution. The reenactment provision of section 2 (b) of article IX of the New York State Constitution provides as follows:
“Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature:
“(1) Shall enact, and may from time to time amend, a statute of local governments granting to local governments powers including but not limited to those of local legislation and administration in addition to the powers vested in them by this article. A power granted in such statute may be repealed, diminished, impaired or suspended only by enactment of a statute by the legislature with the approval of the governor at its regular session in one calendar year and the re-enactment and approval of such statute in the following calendar year” (emphasis added).
However, excluded from petitioners’ argument is any reference to the Statute of Local Governments which the State Legislature enacted in 1964 in accordance with section 2 (b) (1) of article IX of the New York State Constitution. (Statute of Local Governments § 11.) Section 11 of the Statute of Local Governments entitled “Reservation of power by legislature” provides as follows:
“The legislature hereby excludes from the scope of the grants of powers to local governments in this statute and reserves to itself the right and power to *242 enact any law described in this section notwithstanding the fact that it repeals, diminishes, impairs or suspends a power, granted to one or more local governments in this statute: . . .
“2. Any law enacted as provided by paragraph two of subdivision (b) of section two of article nine of the constitution on request of the legislative body of each affected local government, on request of the chief executive officer of each affected local government concurred in by its legislative body or, except in the case of the city of New York, on certificate of necessity from the governor.”
Accordingly, any special law enacted pursuant to the home rule message of section 2 (b) (2) of article IX of the New York State Constitution becomes power reserved to the State Legislature under section 11, subdivision (2), of the Statute of Local Governments. Therefore, because the NIFA Act was enacted at Nassau County’s request pursuant to section 2 (b) (2) of article IX of the New York State Constitution, the NIFA Act’s mandates upon the County are specifically excluded from the powers granted to the County by the Statute of Local Governments. The court finds that the reenactment requirement of section 2 (b) (1) of article IX of the New York State Constitution applies only to powers granted by the Statute of Local Governments to Nassau County. The exclusion of the NIFA Act from the Statute of Local Governments powers under section 11, subdivision (2), because it was enacted pursuant to the home rule message of section 2 (b) (2) of article IX of the New York State Constitution, renders the reenactment requirement of section 2 (b) (1) of article IX of the Constitution inapplicable.
There is no requirement that any part of the NIFA Act has to be reenacted under the provisions of section 2 (b) (1) of article IX of the New York State Constitution. The reenactment provision of subdivision (b) (1) of section 2 is not subsumed within the home rule message of section 2 (b) (2) of article IX as to be a requirement for reenactment every time a special law is enacted by the State Legislature at the request of a local government. The Constitution does not explicitly provide for it, nor does any statutory authority or case law exist to support petitioners’ proposition. Rather the statutory provisions of Legislative Law § 55 and Statute of Local Governments § 11 (2), when read in conjunction with section 2 (b) of article IX of the New York State Constitution, suggest that the reenactment *243 requirement of section 2 (b) (1) is inapplicable to special laws enacted under the home rule message.
Accordingly, the petitioners have failed to meet their heavy burden of showing the unconstitutionality of the control period statute of Public Authorities Law § 3669 beyond a reasonable doubt.
Statutory Authority of NIFA
NIFA has declared a control period pursuant to Public Authorities Law § 3669, subdivision (1), which provides, in pertinent part, as follows:
“The authority shall impose a control period upon its determination at any time that any of the following events has occurred or that there is a substantial likelihood and imminence of such occurrence: . . . (b) the county shall have incurred a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles, subject to the provisions of this title.”
NIFA claims that the duration of its authority to exercise a control period is governed by Public Authorities Law § 3669 (1), in which the last sentence of that subdivision provides as follows: “Notwithstanding any part of the foregoing to the contrary, in no event shall any control period continue beyond the later of (i) January [1, 2030], or (ii) the date when all bonds of the authority are refunded, discharged or otherwise defeased.”
Petitioners assert that the control period can only be exercised during the interim finance period which expired in the year 2008. (Public Authorities Law § 3651 [14].) Once that period expired, the State no longer had a state interest in the County’s budget. Petitioners further state that pursuant to Public Authorities Law § 3667 (2) the County was only required to submit a financial plan to NIFA covering a four-year period during the interim finance period or during the control period. Only during that specified period can NIFA pass a resolution under subdivision (2) (g) of Public Authorities Law § 3667 if the County fails to modify or amend its budget at the request of NIFA for failing to contain projections of revenues and expenditures that are based upon reasonable and appropriate assump *244 tions and methods of estimation. Petitioners claim that NIFA’s use of projections of budget gaps is only proper in passing a resolution pursuant to Public Authorities Law § 3667 (2) (g) which is a proper trigger for exercising the control period under subdivision (1) (b) of Public Authorities Law § 3669. However, according to petitioners, NIFA cannot utilize projected gaps in the budget in determining the substantial likelihood and imminence of the occurrence of a major operating funds deficit of one percent or more pursuant to Public Authorities Law § 3669 (1) (b) because that would be exercising “predictive judgment” which is not provided for by statute, and that was only allowed during the interim finance period under Public Authorities Law § 3667 (2) which has expired. At the hearing, and in their brief, petitioners analogize to separate legislative acts enacted by the State Legislature for the City of Buffalo and the County of Erie which mentioned the terms “balanced budget” and “projected budget gap” in determining the exercise of a control period by the State.
A fundamental rule of statutory construction when construing statutes under the same legislative act, namely, section 3667 and section 3669 of the Public Authorities Law, is that the court must “take the entire act into consideration, or look to the act as a whole, and all sections of a law must be read together to determine its fair meaning.” (Statutes § 97, at 213.)
“A general expression or a single sentence detached from its context does not reveal the purpose of the statute as a whole, and particular provisions, therefore, should not be torn from their places and, so isolated, be given a special meaning at variance with the general purpose and spirit of the enactment.” (Statutes § 97, at 214.)
The NIFA Act required Nassau County to comply with two separate and distinct reporting obligations. Under subdivision (2) of section 3667, the County was required to provide a four-year financial plan during the interim finance period or control period with annual reports audited by NIFA. The financial plan was required to provide that the major operating funds of the County be balanced in accordance with generally accepted accounting principles. The financial plan was to be developed and approved by NIFA in accordance with the procedures established by subdivision (2) of section 3667. The interim finance period is defined by subdivision (14) of section 3651 of the Public Authorities Law as follows:
*245 “ ‘Interim finance period’ means the period of time from the effective date of this title until the date when (a) the authority shall determine, based on annual audit reports furnished in accordance with this title, that for each fiscal year, through and including fiscal year two thousand eight, that the county has adopted and adhered to budgets covering all expenditures the results of which did not show a major operating funds deficit when reported in accordance with generally accepted accounting principles, subject to the provisions of this title, and shall further determine that in the then current fiscal year there is a substantial likelihood that the results of the county’s operations will not show a deficit in the major operating funds when so reported and (b) the chief fiscal officer shall certify that securities sold by or for the benefit of the county during the fiscal year immediately preceding such date and the then current fiscal year in the general public market satisfied the financing requirements of the county during such period and that there is a substantial likelihood that such securities can be sold in the general public market from such date through the end of the next succeeding fiscal year in amounts which will satisfy substantially all of the capital and seasonal financing requirements of the county during such period in accordance with the financial plan then in effect.”
According to that statute, the interim finance period expired in the fiscal year of 2008.
In addition to the four-year financial plan, and the concomitant annual audit by NIFA with the power to issue new bonds under Public Authorities Law § 3667 (2) and § 3651 (14), the County Executive has another reporting requirement to NIFA as stated under Public Authorities Law § 3667 (4) which, in pertinent part, provides as follows:
“In addition, except to the extent such reporting requirements may be modified pursuant to agreement between the authority and the county, for each fiscal year occurring during the interim finance period or while bonds issued pursuant to this title are outstanding, the county executive shall prepare a quarterly report of summarized budget data depicting overall trends of actual revenues and budget expenditures for the entire budget rather than indi *246 vidual line items and updated quarterly cash flow projections of receipts and disbursements. Such reports shall compare revenue estimates and appropriations as set forth in such budget and in the quarterly revenue and expenditure projections submitted therewith with the actual revenues and expenditures made to date. Such reports shall also compare actual receipts and disbursements with the estimates contained in the cash flow projections, together with variances and their explanation” (emphasis added).
Therefore, subdivision (4) of section 3667 requires the County Executive to provide quarterly reports to NIFA not only during the interim finance period but also “while bonds issued pursuant to this title are outstanding.” This obligation continues even when the interim finance period has expired.
The purpose of the interim finance period as a separate and distinct reporting requirement is revealed by an examination of the legislative history of legislative enactments amending the definition of “interim finance period” as specified in section 3651, subdivision (14), of the Public Authorities Law.
Under the initial legislation of chapter 84 of the Laws of the year 2000, the interim finance period authorized NIFA to perform an annual audit, and to issue new bonds to finance the tax certiorari debt, which authority was due to expire in 2004. (L 2000, ch 84.) The explanation for the law as provided by the Legislature states:
“It is further found and declared that authorization for the Nassau county interim finance authority to issue debt shall be for four years only (other than any refinancing of authority debt) and the agreements for financial and budgetary discipline between such interim finance authority and the county shall be for only such interim finance period as is necessary under the standards set forth in this act to restore the county of Nassau to fiscal integrity.” (L 2000, ch 84, § 1.)
However, the Legislature amended subdivision (14) of section 3651 of the Public Authorities Law to extend the duration of the interim finance period from 2002 until 2005 (L 2002, ch 528, § 1). The purpose of the 2002 legislation as stated in the Senate Introducer’s Memorandum in Support of the 2002 Legislation, chapter 528, states as follows: “Section 1 amends Section 3651 of the Public Authorities Law in regard to the def *247 inition of ‘Interim Finance Period’ which extends the oversight authority of NIFA for one additional year if the county projects the need to finance property tax refunds for the year 2005.” In 2003, legislation was again enacted to extend the duration of the interim finance period to 2007 with the stated purpose as follows:
“Senate Bill 5543 extends the oversight authority of the Nassau Interim Finance Authority (NIFA). At present, NIFA has approved the County’s four-year financial plan and, should the Governor enact S. 5543, the annual reporting and oversight of the County’s debt management would continue for such time through and including fiscal year 2007. . . .
“The sole purpose and intent of this legislation is limited to the aforementioned extension of NIFA’s annual reporting and oversight powers.” (Bill Jacket, L 2003, ch 314, at 3 [emphasis added].)
The presiding County Executive of Nassau County, Thomas Suozzi, opposed the Legislature’s proposed extension of the interim finance period to 2007 because
“[t]he extension of the interim finance period to 2007 is unnecessary and redundant. The NIFA Act already contains a mechanism for continuing oversight: a control period would be triggered anytime NIFA bonds are outstanding and the County runs a negative operating fund balance of one percent or greater. . . . The additional oversight of an interim finance period is, however, an additional financial burden to the County” (Bill Jacket, L 2003, ch 314, at 11).
In 2007, legislation was enacted to extend the interim finance period to 2008. (L 2007, ch 364, § 3.) The Introducer’s Memorandum in Support states, in pertinent part, the justification for the amendment as follows: “This bill also amends the NIFA act to extend its oversight authority to determine, based on annual reports furnished in accordance with this title for each fiscal year through and including 2008, that the County adopts and carries out its plan in relation to debt management.” (Bill Jacket, L 2007, ch 364, at 3.)
The Senate’s Memorandum in Support of the NIFA Act under chapter 84 of the Laws of 2000 is instructive as to the Legislature’s intent as to the relationship between the statutes Public Authorities Law § 3667 and § 3669. Under the subheading of “County Fiscal Oversight and Control,” a legislative memoran *248 dum in support of NIFA from the New York State Senate states, in pertinent part as follows:
“While the bill generally limits the authority oversight function to one of making recommendations, establishing financial plan guidelines and monitoring of the county’s fiscal affairs (§ 3667-3668), the bill would impose the stricter fiscal constraints of a control period (§ 3669) . . .
“The bill provides for regular authority review of the county’s budgeting and financial plan compliance.” (2000 McKinney’s Session Laws of NY, No. 2, at 1524.)
The Legislature expressed in its legislative findings and declaration to chapter 84 of the Laws of 2000, the NIFA Act, an ongoing state concern by stating:
“It is in the public interest and is the policy of this state to assist municipalities such as the county of Nassau in attempting to provide, without interruption, services essential to their inhabitants while meeting their obligations to the holders of their outstanding securities. The impairment of the credit of the county of Nassau may affect the ability of other municipalities in the state to issue their obligations at normal interest rates. Such effect is a matter of state concern.” (L 2000, ch 84, § 1.)
When subdivisions (2) and (4) of section 3667 and section 3669 of the Public Authorities Law are all construed together, a fair meaning of the NIFA Act is revealed. There is no explicit statutory authority nor is there any fair meaningful interpretation of the legislative history and statutory language of those statutes that would support petitioners’ proposition that the control period must be exercised by NIFA during the interim finance period. The parties all agree that the interim finance period expired in 2008. However, NIFA’s authority that expired in 2008 is the authority to conduct an annual audit, and to issue new debt obligations on behalf of Nassau County. (Public Authorities Law § 3651 [14].) The County’s obligation to submit a four-year plan and annual reports to NIFA under Public Authorities Law § 3667 (2) also expired. But the County still had an obligation to provide quarterly reports to NIFA under Public Authorities Law § 3667 (4) while bonds remained outstanding, and NIFA’s authority to declare a control period under Public Authorities Law § 3669 (1) continued while the bonds remain outstanding.
*249 Petitioners rely on the case of City of New York v Patrolmen’s Benevolent Assn. of City of N.Y. (89 NY2d 380 [1996]) for the proposition in support of their position that a strict reading of the NIFA Act is required to ascertain the stated purpose of the state concern. The issue in this case was whether a particular statute — chapter 13 of the Laws of 1996 — was unconstitutional because it was not enacted in compliance with the home rule requirements of article IX, § 2 of the State Constitution. At the time, the collective bargaining agreement between New York City and defendant Patrolmen’s Benevolent Association had expired on March 31, 1995 and the parties were unable to come to an agreement on a new agreement. The following January, the City asked that pursuant to existing procedures an “impasse panel” be appointed to resolve the matter. At the same time the State Legislature passed a law — chapter 13 — which granted to the Public Employment Relations Board the exclusive right to resolve matters between these parties. The City maintained that the law was unconstitutional because it dealt directly with the “property, affairs or government” of the City and was not enacted to further a matter of significant state interest. The Court of Appeals agreed, holding that because this was a “special law” of New York City, and that there was not a sufficient state interest, and a home rule message had not been requested, the statute was unconstitutional.
Of course, in the case before this court, the County requested and passed a home rule message which was likewise approved by the Legislature and the Governor. The significant state interest was clearly discernable within the home rule message itself and the legislative history of the NIFA Act. Therefore the court finds that petitioners’ contention that the state interest expired at the conclusion of the interim finance period in 2008 and that the State Legislature did not express a state concern within the NIFA Act is without merit, and their reliance upon the case of City of New York v Patrolmen’s Benevolent Assn. of City of N.Y. (supra) as controlling is misplaced and distinguishable from the action before this court.
The NIFA Act was enacted by the State Legislature at the request of the County Executive and the County Legislature pursuant to the home rule message of the State Constitution. (NY Const, art IX, § 2 [b] [2].) The State Legislature expressed in its legislative findings and declaration to chapter 84 of the Laws of 2000 an ongoing state concern regarding the inhabitants of Nassau County and its obligations to the holders of their *250 outstanding securities. (L 2000, ch 84, § 1.) Furthermore, the Senate’s Memorandum in Support of the NIFA Act under chapter 84 of the Laws of 2000 shows the intent of the Legislature to make the control period of Public Authorities Law § 3669 a stricter fiscal constraint separate and apart from the constraints established under Public Authorities Law § 3667. (2000 McKinney’s Session Laws of NY, No. 2, at 1524.) In addition, the letter of former County Executive Thomas Suozzi is indicative of the fact that the interim finance period imposed an additional obligation upon the County under Public Authorities Law § 3667 (2) to provide annual reports to NIFA in addition to the obligation that the County has to submit quarterly reports to NIFA during the interim finance period or while there are bonds outstanding. In the letter, there is a recognition by the County Executive that “[t]he NIFA Act already contains a mechanism for continuing oversight: a control period would be triggered anytime NIFA bonds are outstanding and the County runs a negative operating fund balance of one percent or greater.” (Bill Jacket, L 2003, ch 314, at 11.)
Finally, Nassau County issued bonds on December 2, 2010 for $125 million, and on November 16, 2010 for $270 million with a notice provision to potential new bond purchasers on page A-12, paragraph one, which stated “The interim finance period under the NIFA Act expired at the end of 2008,” and then in paragraph four of that same notice stating
“NIFA is further empowered to impose a control period, as defined in the NIFA Act, upon its determination that any one of the following events has occurred or that there is a substantial likelihood and imminence of its occurrence: ... (2) the County shall have incurred a major operating funds deficit of 1% or more in the aggregate in the results of operations during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles (‘GAAP’)” (Notice of cross motion, exhibit 5, General Bond Obligation, Dec. 2, 2010, at A-12).
Clearly as late as December of 2010, Nassau County recognized NIFA’s authority to declare a control period even though the interim finance period expired.
The court finds there is no merit to petitioners’ claim that NIFA should not be able to utilize a projected budget gap in determining under Public Authorities Law § 3669 (1) (b) that there is a substantial likelihood and imminence of the occur *251 rence that the County shall have incurred a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year. Petitioners state that the one percent budget deficit is not “imminent” since it has not already occurred, and that NIFA should not be able to exercise the control period 26 days into the new fiscal budget year, but should have to wait a year until the budget deficit has actually been incurred. Petitioners coin the phrase “predictive judgement” which term does not appear anywhere in the NIFA Act, and claim that NIFA cannot utilize predictive judgment in determining the one percent deficit for triggering the control period under Public Authorities Law § 3669 (1) (b).
Again, petitioners view the NIFA Act piecemeal rather than as a whole. Clearly, even though the interim finance period expired, the bonds are still outstanding and the County’s statutory obligation under Public Authorities Law § 3667 (4) to submit quarterly reports to NIFA that contain “quarterly cash flow projections” and “quarterly revenue and expenditure projections submitted therewith with the actual revenues and expenditures” remain. (Public Authorities Law § 3667 [4].) Obviously, NIFA utilized those quarterly reports with projections for cash flow and revenues and expenditures to reach its determination under Public Authorities Law § 3669 (1) (b) that there is a substantial likelihood and imminence that the County shall incur a major operating funds deficit of one percent or more in the operating funds. While petitioners are correct that the actual language of Public Authorities Law § 3669 (1) (b) does not use the word “projections,” the quarterly reports to be submitted by the County Executive to NIFA as required by Public Authorities Law § 3667 (4) does require the reports to contain quarterly cash flow projections as well as revenue and expenditure projections.
It would appear that the sole purpose of the Legislature requiring the County to provide said quarterly reports to NIFA would be to make use of same in determining whether it should exercise a control period under Public Authorities Law § 3669 (1) (b). Furthermore, the use of the word “imminence” of occurrence in subdivision (1) of section 3669 contemplates that the statute is forward looking in its application. The word “imminence” as defined by Webster’s Dictionary means something about to happen. Contrary to petitioners’ belief, a projected budget gap which signifies the County is about to incur a major operating funds deficit of one percent or more in the operating *252 funds is a forward looking event contemplated by the statute. The statute does not state that the event under subdivision (1) (b) of section 3669 of the Public Authorities Law has had to already occur before NIFA could exercise a control period.
Finally petitioners’ referencing the language of other state legislative acts enacted for the City of Buffalo and Erie County in order to interpret the NIFA Act is an improper application of the rule of statutory construction. Section 97 of chapter six entitled “Construction and Interpretation” of the Book of Statutes requires that the court only construe the parts of a single legislative act as a whole to determine its fair meaning and legislative intent. It does not apply to comparing separate unrelated legislative acts with one another. (Statutes § 97, at 211.)
Arbitrary and Capricious
The single remaining claim is that NIFA’s determination is arbitrary and capricious.
“[A]n administrative determination is arbitrary and capricious when it exceeds the agency’s statutory ‘authority or [is made] in violation of the Constitution or laws of this State.’ ” (Matter of Lipani v New York State Div. of Human Rights, 56 AD3d 560, 561 [2d Dept 2008], quoting Matter of Pasieka v New York City Tr. Auth., 31 AD3d 769, 770 [2d Dept 2006].) “Such an arbitrary administrative determination requires reversal, on the law, ‘even though there is in the record substantial evidence to support the determination made.’ ” {Matter of Lipani v New York State Div. of Human Rights at 561, quoting Matter of Charles A. Field Delivery Serv. [Roberts], 66 NY2d 516, 520 [1985].)
A determination is also arbitrary and capricious if it “is without sound basis in reason and is generally taken without regard to the facts.” {Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974].)
“[I]n a proceeding seeking judicial review of administrative action, the court may not substitute its judgment for that of the agency responsible for making the determination, but must ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious. Moreover, where, as here, the judgment of the agency involves factual evaluations in the area of the agency’s *253 expertise and is supported by the record, such judgment must be accorded great weight and judicial deference.” (Flacke v Onondaga Landfill Sys., 69 NY2d 355, 363 [1987] [citation omitted], citing Matter of Eastern Milk Producers Coop. Assn. v State of New York Dept. of Agric. & Mkts., 58 NY2d 1097 [1983]; Matter of Fogelman v New York State Dept. of Envtl. Conservation, 74 AD3d 809, 810 [2d Dept 2010].)
A court may not “second-guess thoughtful agency decision making” or “ ‘substitute [its] judgment for that of the agency for it is not [the court’s] role to “weigh the desirability of any action or [to] choose among alternatives.” ’ ” (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 232 [2007], quoting Akpan v Koch, 75 NY2d 561, 570 [1990], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986].) “ ‘The courts may not weigh the evidence or reject the choice made by [an administrative agency] where the evidence is conflicting and room for choice exists.’ ” (Matter of New York City Tr. Auth. v New York State Pub. Empl. Relations Bd., 78 AD 3d 1184, 1185 [2d Dept 2010], quoting Matter of Stork Rest. v Boland, 282 NY 256, 267 [1940].) In those circumstances, deference is afforded an agency’s determination unless its determination is irrational or unreasonable. (Matter of LaCroix v Syracuse Exec. Air Serv., Inc., 8 NY3d 348 [2007].)
In fact, “ ‘[an agency] is entitled to a “high degree of judicial deference, especially when . . . act[ing] in the area of its particular expertise,” and thus petitioners bear the “heavy burden of showing” that [an agency’s] . . . methodology “is unreasonable and unsupported by any evidence.” ’ ” (Matter of Pinegrove Manor II, LLC v Daines, 72 AD3d 1096, 1097 [2d Dept 2010], quoting Matter of Nazareth Home of the Franciscan Sisters v Novello, 7 NY3d 538, 544 [2006], rearg denied 7 NY3d 922 [2006], quoting Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 331-332 [1995].)
“ ‘Reviewing courts are not entitled to interfere in the exercise of discretion by an administrative agency unless there is no rational basis for such exercise of discretion or the action complained of is arbitrary or capricious.’ ” (Matter of Pinegrove Manor II, LLC v Daines at 1097, quoting Matter of Glen Is. Care Ctr. v Novello, 306 AD2d 477, 478 [2d Dept 2003].)
*254 “Judicial review of the propriety of any administrative determination is limited to the grounds invoked by the agency in making its determination.” (Matter of Missionary Sisters of Sacred Heart, III. v New York State Div. of Hous. & Community Renewal, 283 AD2d 284, 288 [2d Dept 2001].) In affirming a determination, the court may not substitute what it considers to be a “more adequate or proper basis” for it. (Matter ofMontauk Improvement v Proccacino, 41 NY2d 913, 913 [1977], citing SEC v Chenery Corp., 332 US 194 [1947].)
Nevertheless, “[a] determination of an administrative agency that neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious.” (Matter of Corona Realty Holdings, LLC v Town of N. Hempstead, 32 AD3d 393, 395 [2d Dept 2006]; Matter of Al Turi Landfill v New York State Dept. of Envtl. Conservation, 289 AD2d 231 [2d Dept 2001], affd 98 NY2d 758 [2002].) “An agency’s failure to provide a valid and rational explanation for its departure from its prior precedent ‘mandates a reversal, even though there may be substantial evidence in the record to otherwise support the determination.’ ” (Matter of Corona Realty Holdings, LLC v Town of N. Hempstead at 395, quoting Matter of Al Turi Landfill v New York State Dept. of Envtl. Conservation at 233; see also Matter of Lucas v Board of Appeals of Vil. of Mamaroneck, 57 AD3d 784, 785-786 [2d Dept 2008].) “Where, however, [an agency] ‘provides a rational explanation for reaching a different result on similar facts, the determination will not be viewed as either arbitrary or capricious.’ ” (Matter of Waidler v Young, 63 AD3d 953, 954 [2d Dept 2009], quoting Matter of Berk v McMahon, 29 AD3d 902, 903 [2d Dept 2006].) Accordingly, “even where there has been a reversal of a prior administrative decision, it will be upheld if the proffered reasons for the reversal or modification find rational support.” (Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d 290, 296 [1st Dept 2010], Iv denied 15 NY3d 714 [2010].) An agency “ ‘may refuse to duplicate previous error; it may change its views as to what is for the best interests of [its governed]; it may give weight to slight differences which are not easily discernible.’ ” (Matter of Waidler v Young at 954, quoting Knight v Amelkin, 150 AD2d 528, 529 [2d Dept 1989].)
Furthermore, where the pertinent facts are not essentially the same and are “markedly different,” the agency is not required to distinguish its determination from its prior hold *255 ings. (See Matter of Mohawk Val. Organics LLC v New York State Dept. of Envtl. Conservation, 13 AD3d 938, 940 [3d Dept 2004], Iv denied 5 NY3d 704 [2005].) The rule “does not . . . require the [agency] to explicitly distinguish in its written decisions each and every arguably similar case that it previously has decided.” (Matter of Westney [Classic Airport Share-Ride], 262 AD2d 894, 895 [3d Dept 1999]; Matter of Blount [Whalen's Moving & Stor. Co. — Sweeney], 217 AD2d 879, 8780 [3d Dept 1995].) “[D] espite some similarities between [a] matter . . . and the prior cases . . . , [a] decision ultimately reached by [an agency] is not inconsistent [if the matter] is sufficiently distinguishable” from the prior ones. (Matter of Westney [Classic Airport Share-Ride] at 895.)
This court is not insensitive to the fact that NIFA’s review appears to have become more stringent this year in comparison to the past. It is clear that some of the County’s budgeting practices which NIFA previously allowed to one extent or another and on which the County clearly relied in drafting its budget were not permitted this year. In fact, it is questionable whether a control period would have been imposed if prior practices had been followed. Nevertheless, NIFA’s determination appears to be supported by the record and the divergent methods employed here have been justified by both the present facts as well as NIFA’s reasoning.
The determination that “there exist [ed] a substantial likelihood and imminence that [the County] will incur a major operating funds deficit of more than one percent in the aggregate results of operations during its Fiscal Year 2011 assuming all revenues and expenditures are reported in accordance with [GAAP]” does not appear to be arbitrary and capricious. The County’s budget totals $2.7 billion so a $27 million deficit requires NIFA’s imposition of a control period under the act. NIFA’s conclusion in September 2010 that the risky revenues and savings totaled $244.4 million is grounded in sound accounting practice. Even when adjusted so as to allow certain revenues or savings which NIFA deemed risky, some of which were identified post-submission of the budget, a likelihood of a deficit greater than one percent remains. In fact, even the County’s own Comptroller and Office of Legislative Budget Review have forecast similar deficits.
Contrary to the County’s argument, whether there is a substantial likelihood and imminence of a one percent or greater deficit can and in fact ought to be determined now, not in Feb *256 ruary 2012 when the deficit will have already occurred. As the County maintains, the plain meaning of “substantial likelihood” is “considerably probably” and the plain meaning of “imminence” is “certain and very near, impending and on the point of happening.” To interpret Public Authorities Law § 3669 (1) (b) as requiring NIFA to wait until the fiscal year is over to determine whether a one percent or larger deficit is substantially likely or imminent as the County would have this court do not only makes no sense, it contravenes the very purpose of the act. Such an interpretation is in derogation of the principles of statutory interpretation as it essentially strips section 3669 (1) (b) of the act of its clear meaning.
The County’s reliance on its ability in prior years to avert the consequences of revenues and savings deficits that NIFA had found at risk and to end with a balanced budget hardly establishes that it is likely that it will be successful in doing so this year. More importantly, it does not establish that NIFA’s present projection is unfounded. That conclusory assertion fails to establish that NIFA’s finding is arbitrary and capricious.
Similarly unavailing is the County’s reliance on Public Authorities Law § 3667 (1) which, with specific limitations, permitted it to include funds borrowed to pay tax certiorari obligations as operating revenues from 2001 through 2007. The statute’s silence with respect to the County’s right to continue that practice hardly establishes an unfettered right to do so. Rather, it is the requirement set forth in the act to adhere to GAAP that governs and its application precludes that practice. Indeed, the allowance of that practice that was set forth in the statute was obviously done to enable an end run around the application of GAAP during those years. Furthermore, NIFA historically gradually required the County to employ at least in part PAYGO to pay tax certiorari obligations, to the tune of $150 million in 2008, 2009 and 2010. It was the County’s attempt to completely reverse this process in 2011 which NIFA simply could not permit.
The County’s complaint that NIFA’s disallowance of borrowed funds as operating revenue constituted an about-face by NIFA is refuted throughout NIFA’s public records. It repeatedly cautioned the County that this was in contravention of the goals of the act and must be phased out.
The fact that NIFA allowed the County to budget a portion of funds borrowed for tax certiorari obligations as operating revenues in 2008-2010 does not establish that NIFA’s determi *257 nation regarding the 2011 budget is incorrect, either. Not only-does the projected deficit for 2011 exceed one percent even were the $100 million in borrowed funds permitted to count as operating revenues, which was not the case in 2008, NIFA is simply not precluded from correcting an egregious albeit inexplicable error of that magnitude; an error contributed to by representations by the County’s bond counsel which was promoted by the County Attorney’s office.
Moreover, as for NIFA’s alleged divergence from its prior practices and policy, not only are the facts here markedly different than in the past thereby disposing with the need for any explanation or distinction by NIFA, even were one required, it has been adequately provided. The present potential deficit is far greater than in 2008, 2009 and 2010 in which years the published risks were approximately $60 million. In fact, in 2009 NIFA expressed concern about $125.3 million in net risks which the County in response reduced to $53.4 million. In 2010, the permitted net risk was reduced to $62.1 million from $129.6 million. Now, not only has the County abandoned PAYGO for its payment of tax certiorari obligations, the risks, even when cautiously amended, are $149 million. And, unlike in prior years, the County has been unable to assuage NIFA’s concerns. The County’s practice of borrowing funds for tax certiorari obligations and budgeting them as operating revenue was clearly in the process of being phased out but in the 2011 budget has returned to 100% borrowing. Similarly, reserves have fallen to unprecedented lows. To characterize NIFA’s act in imposing a control period as in direct contravention of its prior positions would be inaccurate. As for the County’s complaints that NIFA acted in defiance of the act by failing to assist it by making recommendations, the act does not require that as a prerequisite to the imposition of a control period.
The County’s reliance on the distinction between the NIFA Act and similar acts which govern the City of Buffalo and the County of Erie in which a control period is permitted to be imposed if those entities fail to adopt a balanced budget fails. (See Public Authorities Law § 3959 [1] [a]; § 3858 [1] [a].) Clearly, the authority’s power to impose a control period in those municipalities is greater than in Nassau County. Nevertheless, what justifies the imposition of a control period here is a finding that there exists a substantial likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations *258 during its fiscal year 2011 applying GAAP (Public Authorities Law § 3669 [1] [b].) Interpreting the act as permitting NIFA to impose a control period does not violate any principles of statutory construction: NIFA is not being permitted to impose a control period based solely on the County’s failure to adopt a balanced budget; rather, it is based upon the substantial likelihood and imminence of a one percent deficit.
In conclusion, the County has not sufficiently established a likelihood of success on the merits to entitle it to injunctive relief. Furthermore, whether the County would sustain irreparable harm absent injunctive relief is highly questionable. Indeed, on January 28, 2011, two days after NIFA declared the imposition of a control period, Moody’s declared:
“NIFA’s exercise of its right to move to a hard control board from an advisory board is a credit positive for the county as it should help stabilize financial operations. However, if the County Executive challenges the legality of the board’s right to move to hard control . . . the county could enter into a period of greater budgetary and liquidity stress until the dispute is resolved. In the event the executive files a legal challenge to the board’s right to observe additional control, the rating may be placed on review for possible downgrade.”
And, in this court’s view, a balancing of the equities tips decidedly in favor of NIFA. To prevent it from exercising the powers it has been entrusted with by the NIFA Act to employ which after careful thought and a detailed thorough analysis it has found to be required to do by the act would essentially render it powerless. Indeed, under the circumstances, injunctive relief would cast a shadow over the power of state agencies in general.
Conclusion
The County’s motion for a preliminary injunction is denied.
The act was enacted pursuant to a home rule message from the County and therefore was not required to be enacted and reenacted in the subsequent year pursuant to article IX, § 2 (b) (1) of the New York State Constitution. In any event, a substantial state concern was articulated in the history of the act. The County’s claim that the act is unconstitutional fails and is dismissed pursuant to CPLR 3211 (a) (1).
The time during which NIFA may impose a control period under the act on the grounds relied on by NIFA, Public Authori *259 ties Law § 3669 (1) (b), has not expired. Accordingly, the County’s claim that NIFA lacks the authority to impose a control period under the act also fails and is dismissed pursuant to CPLR 3211 (a) (1).
The County has advanced a valid claim insofar as it maintains that NIFA’s determination that “there exist[ed] a substantial likelihood and imminence that [the County] will incur a major operating funds deficit of more than one percent in the aggregate results of operations during its Fiscal Year 2011 assuming all revenues and expenditures are reported in accordance with [GAAP]” is arbitrary and capricious. That claim is not subject to dismissal pursuant to CPLR 3211 (a) (1), nor is it subject to dismissal pursuant to CPLR 3211 (a) (7) as the allegations, to which this court’s review is limited on such an application, advance a viable claim. (See Matter of Scott v Commissioner of Correctional Servs., 194 AD2d 1042 [3d Dept 1993], citing Matter of Nationwide Cellular Serv. v Public Serv. Commn. of State of N.Y., 180 AD2d 24 [3d Dept 1992], Iv denied 80 NY2d 757 [1992].) Nevertheless, pursuant to CPLR 3211 (c), NIFA’s motion to dismiss the County’s claim that its determination is arbitrary and capricious is hereby converted to a motion for summary judgment. The County is directed to serve and submit its opposition thereto on or before March 29, 2011 and NIFA is directed to submit a reply on or before April 18, 2011, on which date the matter will be submitted for decision. (See Matter of Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d 100 [1984]; Matter of 230 Tenants Corp. v Board of Stds. & Appeals of City of N.Y., 101 AD2d 53 [1st Dept 1984].)